IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CUROLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Court No. 26-01119 |

**COMPLAINT**

Plaintiff Curology Inc. ("Curology"), for its Complaint against Defendants alleges as follows:

**INTRODUCTION**

1. In violation of domestic law and the U.S. Constitution, the Government, through executive orders issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), imposed new tariffs on goods imported into the United States from numerous countries, including the People's Republic of China ("China"), the Republic of China ("Taiwan"), and the Republic of Korea ("South Korea"), from which Curology imports merchandise. As the importer of record, Curology is responsible for paying these tariffs.

2. As applied to imports from China, Taiwan, and South Korea, the Government invoked IEEPA through a series of executive orders issued in early 2025 to impose, increase, and further modify tariffs on Curology's imports. Beginning on February 1, 2025, the Government imposed tariffs on products of China pursuant to a national emergency declared under IEEPA addressing the synthetic opioid supply chain. On April 2, 2025, the Government again invoked

1

IEEPA to establish a reciprocal tariff regime applicable to imports from China, Taiwan, South Korea, and other countries. These executive orders, including Executive Orders 14195[1] and 14257,[2] and the amendments and modifications thereto (collectively, the "Challenged Executive Orders"), imposed and continue to impose tariffs on Curology's imports from China, Taiwan, and South Korea (the "IEEPA Tariffs").

3. Through these executive orders, the Government effectively asserts that IEEPA authorizes the unilateral imposition of tariffs. That assertion contravenes both the plain text of IEEPA and the U.S. Constitution.

4. The plain text of IEEPA, 50 U.S.C. § 1701 *et seq*., does not authorize IEEPA Tariffs. *See* 50 U.S.C. § 1701(b) (granting the Executive certain powers that "may only be exercised to deal with an *unusual and extraordinary threat* with respect to which a national emergency has been declared . . . and *may not be exercised for any other purpose*." (emphasis added)). Indeed, it does not even mention tariffs. *See id.*

5. The word "tariff" does not appear anywhere in the relevant statute, *see* 50 U.S.C. § 1702, and no Executive, in the nearly 50 years since IEEPA was enacted, has relied on these emergency powers to promulgate tariffs.

6. Under the U.S. Constitution's Taxing and Spending Clause, the ability to impose tariffs is vested exclusively with Congress—not the Executive. *See* U.S. Const. art. I, § 8, cl. 1 (granting Congress the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises").

---

[1] Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025).
[2] Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025).

7.	Even if IEEPA was interpreted to grant the Executive the powers to impose tariffs, the IEEPA Tariffs violate the nondelegation doctrine because IEEPA provides no intelligible principle. *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025). And such an interpretation would fall afoul of the major questions doctrine, which requires Congress to speak clearly if it wishes to assign matters of vast economic and political significance to the Executive Branch. *See West Virginia v. EPA*, 597 U.S. 697, 716 (2022); *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023). Levying tariffs on billions of dollars' worth of imports—including Curology's imports—plainly implicates this doctrine. *See* U.S. Customs & Border Prot., *Trade Statistics* (last visited Feb. 19, 2026) *available at* https://perma.cc/S9CN-H3MV (collecting $88.07 billion in total duty, taxes, and fees in 2024).

8.	Indeed, the courts that have reached the merits of legal challenges to IEEPA Tariffs have held that they are unlawful: the U.S. District Court for the District of Columbia concluded IEEPA does not provide tariff authority, and a three-judge panel of this Court held the Executive exceeded any authority under IEEPA—decisions that the Federal Circuit affirmed in relevant part. *See Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025); *V.O.S. Selections, Inc. v. Trump*, 772 F. Supp. 3d 1350, 1383 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

9.	The Federal Circuit affirmed this Court's decision. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

10.	The U.S. Supreme Court consolidated *V.O.S. Selections* and *Learning Resources*, and heard oral argument on November 5, 2025. The U.S. Supreme Court is expected to rule on the legality of the IEEPA Tariffs and underlying executive orders in the near future.

3

11. However, this action remains necessary given the unsettled and evolving posture of the Government's position regarding reliquidation and refunds of unlawfully collected tariffs. In prior litigation, the Government has taken the position that tariffs paid pursuant to unlawful tariff actions are permanently unrecoverable following liquidation. *See In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365–66 (Ct. Int'l Trade 2021) ("Government's position that any duties paid are permanently unrecoverable regardless of . . . unlawful[] collection"). More recently, in litigation challenging the IEEPA Tariffs, the Government has represented that it would not oppose this Court's authority to order reliquidation and refunds following a final and unappealable decision on the merits, and this Court has relied on those representations in denying preliminary injunctive relief. *See AGS Co. Auto. Sols. v. U.S. Customs & Border Prot.*, Slip Op. 25-154, Consol. Ct. No. 25-00255 (Ct. Int'l Trade Dec. 15, 2025).

12. No such representation has been made as to Curology or its entries, and the Government's position as applied to Curology remains unresolved. Entries for which Curology has paid tariffs imposed pursuant to the Challenged Executive Orders began liquidating on or about January 6, 2026. Even assuming the availability of reliquidation in principle, the refund of IEEPA Tariffs, in the words of Justice Barrett, "could be a complete mess"[3]—both logistically and temporally—as Curology and other importers seek to reclaim billions of dollars in tariffs imposed and collected by the Government on an uncertain timeline.

13. Curology brings this action to ensure that the legality of the Challenged Executive Orders as applied to its entries is adjudicated by this Court, and to preserve its entitlement to

---

[3] *See* Transcript of Oral Argument, *Learning Resources, Inc. et al. v. Trump et al.* and *Trump et al. v. V.O.S. Selections et al.*, S. Ct. Nos. 24-1287 and 25-250, at 153 (Barrett, J.), *available at* https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-1287_b07d.pdf.

4

declaratory, injunctive, and monetary relief consistent with this Court's precedent and any representations made by the Government regarding the availability of such relief.

14. This Court should set aside Defendants' actions as *ultra vires*, and otherwise contrary to law, and order Defendants to refund—with interest—any tariffs paid by Curology pursuant to the IEEPA Tariffs.

15. Accordingly, for itself, Curology seeks (1) a declaration that the IEEPA Tariffs are unlawful; (2) injunctive relief[4] preventing Defendants from imposing further tariffs on Curology's imports under IEEPA or the Challenged Executive Orders; and (3) a full refund of all IEEPA Tariffs that Curology has paid and those it will continue to pay, including the applicable interest to which Curology is entitled by statute.

## PARTIES

16. Curology is a U.S.-based company organized under the laws of Delaware. Curology provides custom-formula skincare products to consumers across the United States allowing greater access to dermatological prescription skincare. Curology has made numerous entries of products subject to the IEEPA Tariffs, including, but not limited to, beauty or make up preparations (Harmonized Tariff Schedule of the United States ("HTSUS") heading 3304), mechanical appliances for spraying liquids or powders (HTSUS heading 8424), which includes simple piston pumps and powder bellows (HTSUS subheading 8424.20.10). Curology is the importer of record for the subject entries and paid the tariffs and charges at issue.

17. Defendant U.S. Customs and Border Protection ("CBP") is a component agency of the U.S. Department of Homeland Security, headquartered in Washington, D.C. CBP is

---

[4] In light of this Court's order dated December 15, 2025, denying the plaintiffs' motion for preliminary injunction in *AGS Company Automotive Solutions v. U.S. Customs & Border Protection et al.* (Slip. Op. 25-154), this Complaint is not accompanied by a similar motion. Plaintiff reserves the right to file such a motion in the event that it becomes necessary.

responsible for border security and for the assessment and collection of tariffs, duties, taxes, and fees on goods imported into the United States. CBP assessed and collected the IEEPA Tariffs paid by Curology.

18. Defendant Rodney S. Scott is the Commissioner of CBP. In his official capacity, Rodney S. Scott oversees CBP's assessment and collection of the IEEPA Tariffs paid by Curology.

19. Defendant United States of America received the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

## JURISDICTION AND STANDING

20. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1581(i)(1)(B) and 2631(i). Section 1581(i)(1)(B) provides that the U.S. Court of International Trade has "exclusive jurisdiction" over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."

21. Curology has standing because it is the importer of record that has paid unlawful IEEPA Tariffs pursuant to the executive orders challenged in this action. The payment of those unlawful tariffs injured Curology, and the declaratory, injunctive, and monetary relief sought would redress those injuries.

22. This action is timely because it is commenced "within two years after the cause of action first accrue[d]," 28 U.S.C. § 2636(i). The Challenged Executive Orders were issued on February 1, 2025, and April 2, 2025. Curology first paid IEEPA tariffs on or about February 22, 2025.

## **GENERAL ALLEGATIONS**

**I.     The Text of IEEPA Does Not Authorize the Executive to Impose Tariffs, and the U.S. Constitution Forbids Such an Interpretation.**

23.    The power to impose tariffs is vested exclusively with Congress pursuant to the Taxing and Spending Clause. *See* U.S. Const. art. I, § 8, cl. 1 (granting Congress the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises"). Because the U.S. Constitution vests this power with Congress, the Executive's power to impose or alter tariffs is limited expressly to circumstances in which Congress provides specific authorization with an intelligible principle. *See Mistretta v. United States*, 488 U.S. 361, 372 (1989).

24.    Congress has delegated limited tariff authority to the Executive only through specific trade statutes in Title 19, cabined by substantive, procedural, and temporal limits, such as Section 122 and Section 301 of the Trade Act of 1974. *See, e.g.*, 19 U.S.C. §§ 2132(a), 2411(c).

25.    IEEPA, however, contains no delegation to impose "tariffs," "duties," or "taxes"; its verbs—"investigate," "regulate," "direct and compel," "nullify," "void," "prevent," and "prohibit"—concern regulatory control over property interests, not the revenue-raising power to tax. 50 U.S.C. § 1702(a)(1)(B). Indeed, the word "tariff" does not appear anywhere in the relevant statute. *See* 50 U.S.C. § 1702.

26.    IEEPA grants the Executive certain powers that "may only be exercised to deal with an *unusual and extraordinary threat* with respect to which a national emergency has been declared," and expressly states that it "*may not be exercised for any other purpose*." 50 U.S.C. § 1701(b) (emphasis added).

27.    Reading IEEPA to contain a hidden tariff power would violate separation of powers and raise grave constitutional problems under the major questions doctrine and the nondelegation doctrine. *See West Virginia*, 597 U.S. at 721; *Nebraska*, 600 U.S. at 504–06.

7

28. The nondelegation doctrine requires Congress to supply an intelligible principle to guide the exercise of delegated legislative authority. *Gundy v. United States*, 588 U.S. 128, 145 (2019). IEEPA contains no intelligible principle governing tariff policy—no policy standard, boundaries, or limits specific to tariffs. Thus, any construction of IEEPA that authorizes tariffs would be plainly unconstitutional.

**II.     Defendants Impose Unlawful IEEPA Tariffs.**

29. Despite the lack of authority to impose tariffs under IEEPA, beginning on February 1, 2025, the Government, through the Challenged Executive Orders, invoked IEEPA to impose tariffs on imports from China.[5]

30. On April 2, 2025, the Government again invoked IEEPA through an executive order establishing a reciprocal tariff regime applicable to imports from China, Taiwan, South Korea, and other countries, citing "U.S. trading partners' economic policies that suppress domestic wages and consumption" as an "unusual and extraordinary threat to the national security and economy of the United States" as the asserted basis for action under IEEPA.[6] As applied to Curology's merchandise, that executive order subjected imports from China, Taiwan, and South Korea to additional IEEPA Tariffs, which were subsequently modified through amendments to the Challenged Executive Orders.

31. On May 28, 2025, this Court held that the April 2, 2025, reciprocal tariffs, along with any subsequent amendments, were invalid as "contrary to law." *V.O.S. Selections*, 772 F. Supp. at 1383–84.

---

[5] *See* Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025).
[6] *See* Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025).

32. Notwithstanding this Court's ruling, on July 31, 2025, the Government, through a further executive order modifying the reciprocal tariff regime, adjusted the applicable tariff rates for specific trading partners and modified the reciprocal tariff treatment applicable to imports from Taiwan and South Korea.[7]

33. The Challenged Executive Orders required modifications to the HTSUS, mandating the creation of additional tariff provisions under which goods from China, Taiwan, and South Korea were required to be entered in addition to their ordinary HTSUS classifications.

### III. The Process Through Which CBP Has Implemented the Unlawful IEEPA Tariffs.

34. CBP is responsible for assessing and collecting tariffs on imported merchandise pursuant to the tariff rates and provisions set forth in the HTSUS. *See* 19 U.S.C. §§ 1500, 1502.

35. When merchandise is entered into the United States, the importer of record submits an entry summary identifying the applicable HTSUS classification for the merchandise, including the appropriate heading, subheading, and statistical suffix. CBP reviews the entry for accuracy and assesses tariffs based on the HTSUS provisions applicable at the time of entry.

36. The HTSUS is organized hierarchically. Four-digit headings identify broad classes of merchandise, while six-digit subheadings further subdivide those classes into specific product categories, followed by statistical suffixes for reporting purposes. For example, HTSUS heading 8424 covers "[m]echanical appliances . . . for projecting, dispersing or spraying liquids or powders," while HTSUS subheading 8424.20.10 more narrowly covers "[s]imple piston pump sprays and powder bellows." An importer entering powder bellows would therefore classify the merchandise under HTSUS subheading 8424.20.10. *See* 19 U.S.C. § 1202.

---

[7] Exec. Order No. 14,326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37,963 (Aug. 6, 2025).

37. Under the Challenged Executive Orders, CBP was directed to assess additional tariffs through newly created HTSUS provisions that operate as an overlay to the underlying classification. In practice, this required importers to declare both the ordinary HTSUS classification (e.g., 8424.20.10) and an additional IEEPA-specific tariff provision on the same entry summary.

38. The United States International Trade Commission ("USITC") publishes and maintains the HTSUS, including modifications implemented pursuant to executive action. *See* 19 U.S.C. §§ 1202, 3005, 3006; *Michael Simon Design, Inc. v. United States*, 33 C.I.T. 1003, 1010 (2009) ("The authority to modify the HTSUS lies with the President"); *Maple Leaf Marketing, Inc. v. United States*, 582 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

39. CBP does not independently determine whether the IEEPA tariffs are lawful or applicable as a matter of policy. Rather, CBP applies the tariff provisions specified in the HTSUS, including any additional tariff provisions added pursuant to executive action, in a ministerial manner consistent with its statutory role. *See United States v. U.S. Shoe Corp.*, 523 U.S. 360, 366 (1998) (describing CBP's role as passively collecting duties where it "performs no active role").

40. After assessment, CBP liquidates the entry, which constitutes the final computation of the tariffs assessed on the merchandise. *See* 19 C.F.R. § 159.1. Liquidation reflects CBP's application of the tariff provisions in effect and does not involve an independent determination of the legality of the underlying tariff regime.

**IV.   Curology Has Been—and Will Continue to Be—Harmed by The Unlawful IEEPA Tariffs.**

41. As of the date of this Complaint, Curology has paid tariffs assessed pursuant to the Challenged Executive Orders on merchandise imported into the United States.

42. Curology's imports subject to the IEEPA Tariffs have entered, and continue to enter, the United States.

43. As applied to Curology's imports from China, Curology has paid IEEPA tariffs on a continuous basis since about February 22, 2025, when imports from China were first subjected to the Challenged Executive Orders. Curology has paid IEEPA tariffs on imports from South Korea since about August 29, 2025, when the reciprocal tariff regime first applied to Curology's merchandise from that country. Curology has paid IEEPA tariffs on imports from Taiwan since about December 10, 2025.

44. Entries for which Curology has paid IEEPA tariffs began liquidating on or about January 6, 2026, with additional entries facing imminent liquidation.

45. As a result of the IEEPA tariffs, Curology has suffered financial harm and continues to be harmed by the assessment and payment of unlawful tariffs on its imports.

46. Upon information and belief, CBP has advised importers that liquidation of entries subject to the IEEPA Tariffs will proceed in accordance with the existing statutory framework, without extension beyond the time periods prescribed by statute.

47. In prior litigation involving unlawful tariff actions, Defendants have taken the position that tariffs assessed and collected pursuant to an unlawful tariff regime may be unrecoverable following liquidation. *See In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365–66 (Ct. Int'l Trade 2021) (describing the "Government's position that any duties paid are permanently unrecoverable regardless of . . . unlawful[] collection").

11

# COUNT I

## IEEPA Tariffs Are *Ultra Vires* and In Excess of Statutory Authority
## (*V.O.S. Selections, Inc. v. Trump;* 28 U.S.C. § 2201(a); 19 U.S.C. § 1505(b))

48. Plaintiff Curology hereby incorporates by reference the preceding paragraphs as if fully set forth herein.

49. This Court held in *V.O.S. Selections*, 772 F. Supp. 3d at 1383, that the Executive exceeded his authority under IEEPA, 50 U.S.C. § 1701 *et seq.*, when he imposed these tariffs on imported goods pursuant to his executive orders.

50. The challenged IEEPA Tariffs, which were issued under IEEPA, are materially identical in structure, claimed authority, and effect as those that this Court held unlawful in *V.O.S. Selections*.

51. Under the separation of powers in our constitutional system, the Executive's "power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

52. Moreover, Congress needed to "speak clearly" if it intended to grant the Executive the authority to impose tariffs under IEEPA—a matter of vast economic and political significance. *See West Virginia*, 597 U.S. at 716. Extraordinary grants of power to the Executive require "clear congressional authority" rather than "a merely plausible textual basis for the agency action." *Id.* at 723–24 (citation modified).

53. On its face, IEEPA does not authorize the Executive to impose tariffs—and it certainly does not contain a "clear congressional" authorization to do so. Again, IEEPA does not even use the words "tariff" or "duty." *See* 50 U.S.C. § 1702.

54. Curology is thus entitled to (1) declaratory relief that the Challenged Executive Orders are unlawful and void *ab initio*, (2) injunctive relief preventing CBP from collecting any

further tariffs, and (3) a refund of all IEEPA Tariffs that have been collected and will be collected from Plaintiff Curology, with interest required by law. *See* 19 U.S.C. § 1505(b).

## COUNT II

### IEEPA Tariffs Are Unconstitutional
### (U.S. Const. art. I, § 8, cl. 1)

55. Plaintiff Curology hereby incorporates by reference the preceding paragraphs as if fully set forth herein.

56. In the alternative to Count I, to the extent the Court determines that the Challenged Executive Orders are not *ultra vires*, the IEEPA Tariffs violate the U.S. Constitution because they constitute an impermissible delegation of legislative power to the Executive Branch.

57. The U.S. Constitution vests the power to impose tariffs solely with Congress. *See* U.S. Const. art. I, § 8, cl. 1 (granting Congress the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises").

58. Congress may not delegate its power to the Executive unless it provides, at a minimum, "an 'intelligible principle' to guide the delegee's exercise of authority." *Gundy*, 588 U.S. 145.

59. Even if IEEPA was interpreted to grant the Executive the power to impose these challenged tariffs, the IEEPA Tariffs violate the nondelegation doctrine because IEEPA provides no intelligible principle to guide the Executive's use of tariff authority.

60. Thus, under the Taxing and Spending Clause of the U.S. Constitution and the nondelegation doctrine, the imposition of the IEEPA Tariffs is unconstitutional.

61. Curology is thus entitled to (1) declaratory relief that the Challenged Executive Orders are unlawful and void *ab initio*, (2) injunctive relief preventing CBP from collecting any further tariffs from Curology pursuant to the Challenged Executive Orders, and (3) a refund of all

IEEPA Tariffs that have been collected and will be collected from Plaintiff Curology, with interest required by law. *See* 19 U.S.C. § 1505(b).

## COUNT III

### Declaratory Relief – Equitable Powers of the Court
### (28. U.S.C. § 2201(a))

62. Plaintiff Curology hereby incorporates by reference the preceding paragraphs as if fully set forth herein.

63. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

64. Curology's claims present an actual controversy as to the Executive's authority under IEEPA, the constitutionality of IEEPA, and the authority of CBP to implement and collect the resulting tariffs.

65. Curology is the importer of record and has suffered injury by having been required to pay IEEPA Tariffs on goods it has imported into the United States.

66. This Court can exercise its equitable power to enter a declaratory judgment that the Challenged Executive Orders are unlawful for any of the above reasons, and that CBP lacks authority to implement and collect the resulting tariffs, as to Plaintiff.

## PRAYER FOR RELIEF

Wherefore Plaintiff Curology respectfully requests that this Court:

(1) declare that the Executive lacks authority under IEEPA to set tariffs;

(2) declare that the Challenged Executive Orders are *ultra vires* and void *ab initio* with respect to Plaintiff Curology;

(3) declare that, with respect to Plaintiff Curology, CBP lacks authority to implement and collect any tariffs set out in the HTSUS that are based on the Challenged Executive Orders;

(4) enjoin Defendants, with respect to Plaintiff Curology, from imposing and enforcing *any* tariffs set out in the HTSUS that are based on the Challenged Executive Orders;

(5) order the United States to refund Plaintiff Curology the IEEPA Tariffs collected on those entries, with interest provided by law;

(6) award Plaintiff Curology its reasonable costs, including attorneys' fees, incurred in bringing this action; and

(7) grant any further relief as this Court deems proper.

Respectfully submitted,

Dated: February 20, 2026

*/s/ Brett W. Johnson*
Brett W. Johnson, Bar No. 021527
Derek C. Flint, Bar No. 034392
T. Troy Galan, Bar No. 039117
SNELL & WILMER L.L.P.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone:    602.382.6000
Facsimile:    602.382.6070

*Counsel for Plaintiff*